# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 6, 2011

No. 09-41244

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY GILBERT MARTINEZ, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
No. 2:09-CR-557-1

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Anthony Martinez, Jr., appeals the denial of a motion to suppress evidence and the sentencing decision not to award him a two-level reduction for acceptance of responsibility. Finding no reversible error, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-41244

I.

Police received several calls after midnight reporting multiple shots fired in a residential neighborhood. About ten to fifteen officers eventually arrived on the scene, hearing about twenty to twenty-five more gunshots, which they determined were being fired from a high-caliber weapon. They canvassed the neighborhood to determine the source of the shots, ultimately converging on Martinez's home. They blocked off the area and attempted to make contact with Martinez.

Eventually, the officers observed Martinez and three others exiting the residence. The individuals were immediately detained, and Martinez was informed of his *Miranda* rights. At the time, the officers were operating under the assumption that Martinez's actions violated Texas Penal Code § 42.12, a misdemeanor offense that prohibits the reckless discharge of firearms. Martinez admitted that he had fired multiple weapons that night.

Martinez said there were other people inside the house. The officers also assumed that the weapons that had been fired were still inside, because none of the persons who had exited the home were armed, nor were any firearms discovered when the officers blocked off the outside of the house. Given that situation, several officers were sent inside to conduct a protective sweep to check for injuries or accessible weapons.

During the sweep, the officers noticed a gun safe but did not attempt to access its contents. They also discovered shell casings from three different calibers of firearms, a .22 rifle, and additional people. In total, twelve individuals were present in the house that night, six of whom were children (one of which was Martinez's fourteen-year-old son, who also admitted that he had fired a weapon that night).

Following the sweep, the officers escorted Martinez and the others to the living room area. At the time, Martinez was calm and cooperating fully. There

2

No. 09-41244

is conflicting information in the record as to what exactly happened next, a conflict we will discuss in detail in part II.A below. What is evident is that the police eventually gained access to the contents of the gun safe and discovered approximately fifteen to twenty firearms. They seized the three guns identified by Martinez's son as the weapons fired that night, but also recorded the serial numbers of the other firearms.

Later, the police checked all the serial numbers and discovered that two of the firearms still in the gun safe, one of which was a machine gun, were stolen. That information was turned over to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), which executed a federal search warrant and seized the stolen guns. Martinez was indicted on one count of knowingly possessing a machine gun not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; and one count of knowingly possessing a machine gun with a conversion sear, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).

Martinez moved to suppress the evidence of the serial numbers collected that night; the district court denied the motion following a hearing. At a pretrial conference, Martinez attempted to enter a conditional plea of guilty to preserve his right to appeal the suppression ruling, but the court refused to accept a conditional plea or to conduct a bench trial with stipulated facts in which Martinez would be found guilty. Instead, a jury trial was set, which was later converted to a bench trial by agreement. Martinez was convicted of count one, knowingly possessing an unregistered machine gun  (count two, knowingly possessing a machine gun with a conversion sear, was dismissed at the government's request before trial).

During sentencing, Martinez objected to not being afforded a two-level reduction in his offense level for acceptance of responsibility, given his attempts to enter into a conditional plea or to have a stipulated bench trial and his coop-

No. 09-41244

eration with the ATF. The district court denied any credit for acceptance of responsibility. Martinez was sentenced to forty-one months in prison, within the guideline range.

## II.

When considering a ruling on a motion to suppress, we review factual findings for clear error and legal conclusions *de novo*. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). We do not reverse a finding that consent was voluntary unless it is clearly erroneous. *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993). "Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." *Id* (citation omitted). "[W]e view evidence in the light most favorable to the prevailing party—in this case the Government—and indulge all inferences in favor of the district court's denial of the motion to suppress." *United States v. Polk*, 118 F.3d 286, 296 (5th Cir. 1997) (citation omitted).

Whether consent to a search was voluntary is determined by the totality of the circumstances, which a court evaluates by considering six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Kelly*, 981 F.2d at 1470 (citations omitted). Though all six factors are relevant, no single one is dispositive on whether consent was voluntary. *Id*. We note that Martinez does not challenge the legality of initial police entry into his house or the propriety of the protective sweep, but only the search of his gun safe. He argues (1) that he did not voluntarily consent to the search and (2) that even assuming that he did consent to the

4

No. 09-41244

search, the scope of the consent was limited to the firearms fired that night—which would not allow the officers to record the serial numbers of all the firearms found in the safe.

A.

We first determine the facts to be analyzed, because there is conflicting testimony as to what happened. Three officers testified to one set of facts, but witnesses for the defense, including Martinez's son and his friend, testified to another. The district court specifically found the testimony of the officers to be the most credible and thus evaluated the voluntariness of the consent based primarily on the facts testified to by them.

There is no reason to disturb those factual findings: It was not clearly erroneous for the court to credit the testimony of the police officers over that of the defendant's son and friend, particularly in light of the court's conclusion that the son and friend had provided inconsistent testimony regarding other issues. *See United States v. Turner*, 319 F.3d 716, 720-21 (5th Cir. 2003).

Thus, the relevant facts that we consider are these: Following their initial protective sweep of the house, the officers gathered all the occupants, including Martinez's son, in the living room. At this time, Martinez was in handcuffs but was cooperating fully with the officers, to the point that he even admitted that he had been discharging firearms that evening. The police informed Martinez that they were investigating the illegal discharge of firearms in the area and that they were interested in the guns that were used. Martinez responded by stating that the firearms were in the gun safe and nodding in its general direction. The officers went on to explain that they wished to recover the firearms for evidence in case they later discovered that one of the rounds fired had struck an object or an individual. Martinez did not object to the officers's wish to recover the weapons he had fired that night. Additionally, his son stood up and also said

that the weapons were in the safe and pointed to where it was generally located.

The officers then asked Martinez whether they could get those guns out of the safe. Martinez did not immediately respond, but his son stated, "Well, yeah, I'll take you there." The son indicated that he did not know the combination to the safe but that it was written on the side of the safe. The son then left the room with two officers to go to the gun safe. Martinez did not object to any of those actions.

Once Martinez's son had taken the officers to the room containing the safe, he pointed out that the combination to the secure safe was written on the side of the safe. While the two officers were laughing at this lack of security, the son reached down and turned the handle to open the safe, which was unlocked; at no point did the officers instruct him to do so. Once the son began to open the safe, the officers noticed this and stopped him from completing his action. They instructed him to step back, then finished opening the door themselves, whereupon the son identified the three weapons that had been fired that night.

The officers accompanying the son seized those three weapons as evidence and recorded the serial numbers of all the other firearms that were present in the safe. The officers testified that that was common practice whenever they encountered firearms in the course of their duties. They also said that the serial numbers of all the firearms had been recorded for use in case they later discovered more than three weapons had been fired that night or that they had initially seized the wrong weapons.

B.

The district court did not clearly err in concluding that Martinez voluntarily consented to the search of the gun safe. Consent to a search can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent. *See United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.

No. 09-41244

1996). Here, an officer implicitly requested consent to search the safe. When an officer asks an individual where a gun is located, while at the same time repeatedly stating that his goal is to seize the weapon as evidence, that is logically considered an implicit request for consent to search for and recover the weapon. Given that Martinez was implicitly asked to consent to a search, it was not clearly erroneous for the court to conclude that Martinez's decision to remain silent following his specific identification of the location of the firearms, as well as his son's offer to retrieve the firearms, constituted implicit consent to the subsequent search.

Because consent was given, the question is whether it was voluntary. With respect to the six factors, three of them weigh strongly in favor of a finding of voluntariness.

First, the officers used no coercive procedures. Although Martinez was surrounded by police when he consented, the mere presence of armed officers does not render a situation coercive. The officers were not pointing their firearms at anyone and were not threatening Martinez or shouting. They were merely standing in Martinez's living room while engaging him in a relatively polite conversation about the events of that night and the location of the guns in question. As one of the officers testified, "everything began to calm down and we basically started a civil conversation as to why we were there." Furthermore, when Martinez was asked the location of the guns, and when the two officers went with Martinez's son to the gun safe, the relevant officers did not even have their weapons drawn.

Second, Martinez was freely and fully cooperating. He voluntarily admitted to firing weapons that night; he was calm while the officers handcuffed him and conducted the protective sweep; and he was comfortable discussing the events while they were all sitting in his living room. His consent to the search was consistent with the rest of his behavior that night, because at no point did

he fail to provide anything but complete cooperation.

And third, the district court concluded that Martinez possessed sufficient education and intelligence to consent voluntarily. There is no information in the record, nor does Martinez raise any contrary argument in his briefs, to cast doubt on that conclusion.

Of the three remaining factors, one was decided incorrectly: The district court concluded that Martinez did not know that incriminating evidence would be found as a result of the search. That is a clearly erroneous finding.

The officers told Martinez that firing the weapons that night was illegal under state law; thus, he logically had to know that pointing out the location of the firearms would provide the officers with incriminating evidence. That is true even if Martinez was not aware that the search of the gun safe would lead to the federal charges he would eventually face. And yet, the fact that he was likely aware that he was providing the officers with incriminating evidence does not significantly affect our analysis of the voluntariness of the consent. Martinez had already voluntarily admitted to shooting the firearms that night. He was not seeking to conceal that fact, so there is no reason to believe that he would even consider concealing the weapons he had fired.

Those circumstances do not allow us completely to ignore the fact that Martinez consented to a search that he knew would lead to evidence of a crime, but it does lessen the weight we place on that factor when we decide whether it was clearly erroneous for the district court to conclude that consent was voluntary. After all, it would be significantly more likely for a defendant to consent voluntarily to a search that he knew would produce evidence of a crime if he had already voluntarily admitted to committing the crime.

As to the voluntariness of Martinez's custodial status, he was detained but not under arrest when he consented to the search of the safe. Though the Fourth Amendment does not require that a lawfully detained person be informed

No. 09-41244

that he is free to go before his consent to a search is deemed voluntary, *Ohio v. Robinette*, 519 U.S. 33, 35 (1996), the extent of his detention is relevant in our consideration of the totality of the circumstances. The fact that Martinez was being detained in his own house at the time he consented to the search appears to weigh against a finding of voluntariness. Yet, he might have thought that if he refused consent, the officers would have nothing remaining to do and would leave. On the other hand, if he did not voluntarily consent to the search, the police presence and his extended detention were not voluntary, which would mean that this factor weighs against a finding of voluntariness, because Martinez was being detained against his will when he consented to the search. This indeterminancy renders this factor unhelpful as to voluntary consent.

Finally, the record is silent as to whether the officers told Martinez he had the right to refuse consent. This factor does weigh against a finding of voluntariness, but "the failure to advise an individual of the right to withhold consent is not determinative in and of itself" in determining whether the consent given was voluntary. *See United States v. Solis*, 299 F.3d 420, 437 (5th Cir. 2002).

To summarize: Of the six factors, three weigh strongly in favor of a finding of voluntariness; one does not affect the analysis to a significant degree; one has an indeterminate effect on our analysis; and one weighs against a finding of voluntary consent. All six factors are considered in light of the totality of the circumstances. The evidence of Martinez's complete, unwavering, and voluntary cooperation is particularly compelling. Given that strong evidence, and the fact that the only factor that noticeably weighs against voluntariness is the possibility that Martinez may not have been aware of his right to refuse consent, it was not clearly erroneous for the district court to conclude that Martinez voluntarily consented to the search of his gun safe.

9

No. 09-41244

C.

The final issue regarding the search is whether the recording of the serial numbers of all the firearms found in the gun safe exceeded the scope of the voluntary consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Martinez consented to a search of the safe made for the purpose of seizing the weapons that had been fired that night. It is objectively reasonable to assume that the police officers would have to search through all the firearms in the safe so they could properly identify the ones that had been fired. Even though Martinez's son identified the three weapons fired that night, the officers could not be expected to rely on his identification without conducting a search of their own.

As the district court noted, it is reasonable to conclude that the police would have to inventory the firearms in the safe in order eventually to seize all those fired that night—which was the scope of the consent. That is because of the possibility that the officers had initially seized the wrong guns or that more guns had been fired that night than Martinez and his son had identified to the officers. Thus, when Martinez consented to the search, the scope of that consent reasonably included the serial numbers of all the guns in the safe. Furthermore, police officers who come into legal possession of a gun are entitled, if not expected, to record its serial number. *United States v. Wallace*, 889 F.2d 580, 583 (5th Cir. 1989) (citation omitted).

The plain view doctrine also justifies the recording of the serial numbers. For a plain-view seizure to be upheld, four conditions must be satisfied: "(1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incrim-

No. 09-41244

inating character must be immediately apparent—i.e., the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself." *United States v. Paige*, 136 F.3d 1012, 1023 (5th Cir. 1998) (citation omitted).

All four conditions are satisfied. The officers were lawfully examining all the firearms to determine which were the ones being fired that night; the serial numbers were in plain view; the officers had probable cause to believe that any one of those firearms had been illegally fired; and they had a lawful right of access to record the serial numbers.

III.

The sentencing guidelines allow a court to reduce the offense level by two "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Because a sentencing judge is in the best position to evaluate acceptance of responsibility, we review a finding on that "for clear error but under a standard of review even more deferential than a pure clearly erroneous standard." *United States v. Outlaw*, 319 F.3d 701, 705 (5th Cir. 2003) (quotations and citation omitted). A decision to not award a reduction for acceptance of responsibility will be affirmed "unless it is without foundation, a standard of review more deferential than the clearly erroneous standard." *United States v. Juarez Duarte*, 513 F.3d 204, 211 (5th Cir. 2008) (per curiam) (internal quotation marks and citation omitted).

Martinez claims that he should be given credit for acceptance of responsibility because (1) he attempted to enter into a conditional plea; (2) once a conditional plea was not available to him, he attempted to engage in a bench trial with stipulated facts that would lead to a guilty verdict; and (3) he cooperated fully with federal law enforcement officials. The district court, however, disagreed with Martinez on the last point. The court stated that acceptance of re-

sponsibility was being denied "because he misrepresented through hearings and through testimony that he offered the essential facts of the case." Specifically, the court found that Martinez had his son lie under oath to assist Martinez during the suppression hearing and that Martinez lied about how he had obtained the firearms to one of the individuals who wrote a sentencing letter on his behalf. The district court concluded that those actions did not evince acceptance of responsibility. Given the factual findings, such a conclusion is not "without foundation."

AFFIRMED.