# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-40333

United States Court of Appeals
Fifth Circuit

**FILED**

March 29, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

MIGUEL ANGEL ESCAMILLA, JR.,

> Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Miguel Escamilla appeals his convictions for conspiring to possess and possessing with the intent to distribute marijuana and heroin. Pressing five issues, Escamilla argues that the district court erroneously failed to suppress incriminating evidence that government agents obtained from an allegedly unconstitutional stop and ultimate arrest. We hold that much of the agents' conduct was reasonable and therefore constitutional. We also hold, however, that the district court erred by admitting evidence obtained from an unconstitutional, post-arrest search of a cell phone in Escamilla's possession. We nonetheless affirm the judgment of the district court because the error was harmless.

No. 16-40333

I

On December 4, 2014, Border Patrol agents Julio Garcia and David Freed patrolled the privately owned OKM Ranch—approximately thirty miles from the Mexican border—in Laredo, Texas. According to the agents, smugglers "common[ly]" cut through the ranch to avoid two Border Patrol checkpoints at either end of the property. The "legitimate traffic" through the ranch is primarily oil industry workers.

Around 6:30 a.m., the agents, driving southbound through the ranch, saw two similar white trucks driving in the opposite direction. The first truck, a Ford F-250, and the second truck, a Ford F-150, appeared to travel together or "in tandem." A few minutes later, Border Patrol's "drawbridge activation," a camera-like sensor designed to detect illegal entry into the ranch, alerted all nearby agents that a vehicle had entered the ranch "at an undisclosed location . . . where [a vehicle] should not be." Realizing that the trucks they passed resembled the vehicle in the alert, the agents turned around to investigate further.

Upon encountering the trucks again, the agents noticed that they were still traveling in tandem. The agents recognized this manner of driving as common among smugglers: one vehicle is the "load vehicle" carrying contraband, while the other is "a scout or disturbance" vehicle. The trucks were also still traveling north, heading to exit the ranch and circumvent Border Patrol's checkpoints. But at 6:30 in the morning, oilfield workers are usually entering—not leaving—the ranch for work.

The agents focused on the F-150, noticing that it did not bear the customary markings of any oil company, such as a fleet number or work badge displayed from the rear view mirror. Rather, there was a personal decal on its back window—unusual for a company truck. The F-150 also had temporary "paper tags," which are uncommon among legitimate oilfield traffic, but

2

common among smugglers. As the agents followed the F-150, they checked its registration, which revealed a woman's residential address. In the agents' experience, company vehicles are typically registered to a business. Agent Garcia and Agent Freed thought that the F-150 was likely a "clone"—an everyday vehicle intended to resemble a legitimate oilfield truck, but carrying undocumented immigrants or drugs from the border.

When the agents activated their lights to stop the F-150, the F-250 sped away, leading them to believe it was the "load vehicle" carrying contraband. Agent Freed "called in" the F-250, asking other nearby agents to track it down.

Upon stopping the F-150, the agents noticed that its exterior was unusually clean, unlike typical oilfield trucks. As Agent Garcia approached the F-150, he saw that it had no tools or other objects that work trucks usually carry. The truck's fuel cell also looked out of place and lacked a fuel pump, rendering it inoperable. When Agent Garcia asked the driver—Escamilla— what he was doing on the ranch, he seemed "nervous" and "couldn't give . . . a definitive answer." Escamilla said he worked for "Valdez" but did not explain what type of work he did, and Agent Garcia did not recognize the name. Agent Freed then checked Escamilla's license and discovered "a narcotics case" on his record.

As Agent Garcia continued talking to Escamilla, he noticed the interior of the F-150 was also unusually clean. Agent Garcia also noticed that Escamilla wore a shirt that looked similar to a work uniform but lacked company logos or decals. Escamilla then agreed to let Agent Garcia and Agent Freed search the F-150.[1] During the search, Agent Garcia opened the out-of-place fuel cell to find that it was empty and appeared modified or "hollowed out." The agents knew that smugglers often carry drugs in hollowed-out fuel

---

[1] Escamilla does not challenge the agents' search of the F-150.

cells. The agents also saw "fake shirts" and "brand new [generic] vests," which they thought oilfield workers would not usually bring to work. These items corroborated their suspicion that the F-150 was a "clone."

After searching the truck, Agent Garcia asked to search Escamilla's phone. Specifically, he asked, "do you mind if I look through your phone?[,]" and Escamilla silently handed it over. The phone was a simple flip phone—a "burner" in Agent Garcia's opinion—containing only three numbers, two of which were saved under a single letter, rather than a proper name. After searching the phone, Agent Garcia handed it back to Escamilla because, in Agent Garcia's words, he was "done with it."

About ten minutes after stopping Escamilla, Agent Garcia asked if he would allow a Border Patrol dog to sniff his vehicle.[2] When Escamilla consented, Agent Garcia told him to drive approximately two minutes to the ranch's "main gate," where they waited another ten minutes for the dog to arrive. When the dog sniffed the F-150, its handler reported that the dog "alert[ed], but nothing solid." In Agent Garcia's view, this meant "something may have been in [the truck] at some point in time previously [or] recently."

At this point, Agent Garcia called his superior to report Escamilla's behavior. As they spoke, Agent Garcia and Agent Freed simultaneously overheard radio traffic about the F-250. Border Patrol agent Brian Jennings had followed the F-250 out of the OKM Ranch. The F-250 tried to speed away, "ramming [the] gate" at a nearby ranch and "taking out a couple [of] deer-proof fences" before crashing. By the time Agent Jennings reached the wreck, the driver had fled, leaving marijuana and black tar heroin behind. When Agent Jennings reported the drug seizure over his radio—about twenty-four minutes after Escamilla's initial stop—Agent Garcia and Agent Freed arrested

---

[2] Escamilla does not challenge the voluntariness of his consent to the dog sniff.

Escamilla based on his connection to the F-250.

The agents drove Escamilla to a nearby Border Patrol station where they met DEA Agent Jason Antonelli. There, agents took "all of [Escamilla's] personal property . . . from him" and "turned [it] over to the DEA." According to Agent Antonelli, Agent Garcia and Agent Freed told him that Escamilla had "verbal[ly] consent[ed]" to a search of his phone. The Border Patrol agents also gave Agent Antonelli a second phone, broken in half but otherwise identical to the one taken from Escamilla, that Agent Brian Jennings recovered from the wrecked F-250. Agent Antonelli looked through both phones to find their contact numbers.

Agent Antonelli then told Escamilla that he was going to jail and asked him to claim his property from the items Border Patrol agents had taken from him. Escamilla claimed his driver's license, "various bead necklaces," and some change. He did not claim the phone that the Border Patrol agents searched at the OKM Ranch and took from him at the station. When Agent Antonelli's partner asked about it, Escamilla said the phone wasn't his, but that he had used it to call his girlfriend.

The next day, December 5, Agent Antonelli used the contact numbers he discovered from both phones to subpoena their accompanying records from AT&T. AT&T's records revealed that whoever used the two phones called each other 196 times between November 20 and December 4, the day of Escamilla's arrest. The phones texted 29 times during the same period. On December 2, the phone recovered from Escamilla texted a third number to the broken phone from the F-250, and the user of the broken phone called that number on December 4, forming "a triangle connection" among the three devices.

On December 9, Agent Antonelli used a forensic examination program called "Cellebrite" to download any contacts, pictures, or videos from both phones. The Cellebrite program also confirmed the phones' contact numbers,

No. 16-40333

which Agent Antonelli learned from his manual search of the phones five days earlier. For the manual search on December 5 and the Cellebrite search on December 9, Agent Antonelli relied on Escamilla's consent given during the Border Patrol agents' stop on December 4. He never requested a search warrant.

In his resulting prosecution for drug possession and conspiracy, Escamilla moved to suppress the phone that agents recovered from him, its contact number, evidence of calls or texts, and any other "digital data" stored on the phone. After a two-day suppression hearing, the district court determined that the Border Patrol agents lawfully stopped Escamilla. The district court also held that, during the stop, Escamilla voluntarily consented to a search of the phone in his possession, which encompassed Agent Antonelli's manual search at the station, and that Escamilla had abandoned any expectation of privacy in the phone when he disclaimed ownership of it, which justified Agent Antonelli's Cellebrite search. A jury found Escamilla guilty on all counts. After sentencing and entry of final judgment, Escamilla timely appealed, arguing that the district court erred by denying his motion to suppress.

II

When a defendant challenges the district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions about the constitutionality of law enforcement conduct de novo. *United States v. Danhach*, 815 F.3d 228, 232-33 (5th Cir. 2016). We view the evidence in the light most favorable to the prevailing party—here, the Government—and we may affirm the district court's ruling for any reason supported by the record. *Id.* at 233. If we find constitutional error, however, we must reverse the judgment of the district court unless the error is "harmless." Fed R. Crim. P. 52(a); *United States v. Wright*, 777 F.3d 769, 777

6

No. 16-40333

(5th Cir. 2015). Our harmlessness inquiry requires the Government to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict." *United States v. Zavala*, 541 F.3d 562, 581 (5th Cir. 2008).

III

Escamilla argues five issues on appeal: first, that the Border Patrol agents' initial stop was unjustified; second, that, even if justified, the stop was unreasonably prolonged; third, that he did not voluntarily consent to Agent Garcia's search of the phone in his possession during the stop; fourth, that Agent Antonelli's post-arrest searches of the phone were unconstitutional; and fifth, that the evidence obtained from all of this unconstitutional conduct was introduced at trial and contributed to the jury's guilty verdict.

A

The Fourth Amendment's prohibition on unreasonable searches and seizures applies to stopping a vehicle and detaining its occupants. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A vehicle stop complies with the Fourth Amendment if it is justified at inception and law enforcement officers' conduct during the stop is reasonably related in scope and duration to the circumstances justifying the detention. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). Escamilla argues that the Border Patrol agents had no reason to stop the F-150 as he drove through the OKM ranch.[3]

To justify a vehicle stop, officers must have a "reasonable suspicion"—that is, "specific and articulable facts . . . taken together with rational inferences from those facts"—that "criminal activity [is] afoot." *Terry*, 392 U.S. at 21, 30. In considering whether officers reasonably suspect someone of

---

[3] Although Escamilla does not own the F-150, the Government does not dispute Escamilla's standing to challenge the stop.

7

criminal activity, we defer to their law enforcement experience, recognizing that trained officers may draw inferences from certain facts "that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *accord United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

When roving Border Patrol agents stop a vehicle in a "border area," rather than at an official checkpoint, we consider whether several factors (known as the *Brignoni-Ponce* factors) contribute to the agents' reasonable suspicion: (1) the area's proximity to the border; (2) the area's characteristics; (3) the usual traffic patterns on the road; (4) the agents' previous experience with criminal activity; (5) information about recent illegal trafficking in the area; (6) the appearance of the vehicle; (7) the driver's behavior; and (8) the passengers' number, appearance, and behavior. *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)). Because reasonable suspicion is a totality-of-the-circumstances analysis, we consider these factors collectively, not in isolation. *Id.*

Here, all of the factors weigh in favor of the Government. The OKM Ranch is only thirty miles from the Texas-Mexico border, "where many smuggling trips originate." *United States v. Ramirez*, 839 F.3d 437, 440 n.2 (5th Cir. 2016). The ranch is also a "common corridor[]" for smugglers because it circumvents two Border Patrol checkpoints, and "[i]t is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000) (citation omitted). Relying on their years of Border Patrol experience, Agent Garcia and Agent Freed noticed several suspicious facts about the F-150 Escamilla was driving. To start, they were "propelled into action by sensors designed to avoid routine ranch traffic" and discovered "an unfamiliar and atypical-looking oil field vehicle." *United States v. Inocencio*, 40 F.3d 716, 723

(5th Cir. 1994). "Legitimate" ranch traffic usually arrives early in the morning, but at 6:30 a.m., the F-150 appeared to be leaving. *See United States v. Nichols*, 142 F.3d 857, 866 (5th Cir. 1998) (relying on testimony that defendant "was on the road . . . earlier than utility vehicles normally appeared in that area"). The truck also lacked the usual markings of an oil company vehicle, was registered to a residence rather than a business, and had temporary "paper tags," which smugglers often use. *See United States v. Villalobos*, 161 F.3d 285, 289 (5th Cir. 1998) (highlighting a vehicle's use of temporary tags). Escamilla was also driving "in tandem"—a manner of travel common among smugglers—with the F-250 in front of him for several minutes.[4] *Id.* at 290 (noting that this "lead car-load car arrangement . . . . may raise an agent's suspicions"). Accordingly, the district court did not err in concluding that the agents reasonably suspected Escamilla of criminal activity and therefore lawfully stopped his vehicle.

B

Escamilla also contends that the agents unreasonably prolonged the stop by engaging in conduct not reasonably related to their initial suspicion. An officer's conduct is reasonably related to the justification for the stop when the officer "diligently pursue[s] a means of investigation that is likely to confirm or dispel [the officer's] suspicions quickly." *United States v. Pack*, 612 F.3d 341, 361 (5th Cir. 2010) (citing *United States v. Sharpe*, 470 U.S. 675, 686

---

[4] Relying on *United States v. Robert L.*, 874 F.2d 701 (9th Cir. 1989), Escamilla argues that there is insufficient evidence of the F-150 and F-250 traveling "in tandem" because the Border Patrol agents "did not observe [them] travel over very much distance before stopping the F-150." The district court did not explicitly find that Escamilla and the F-250 were driving in tandem, noting only that the "two vehicles were travelling north in close proximity to each other." Viewing the evidence in a light most favorable to the Government, however, supports finding that the trucks were traveling in tandem. The agents first saw the trucks traveling together as the agents drove past them on the main road. After the drawbridge activation alert "a couple [of] minutes" later, agents turned around to follow the trucks (which likely also took a few minutes) and found them *still* traveling together.

No. 16-40333

(1985)).  Officers unreasonably—hence, unconstitutionally—prolong a stop if they detain a person "beyond the time needed to investigate the circumstances that caused the stop." *Id.* at 350.

Escamilla argues only that the agents should have let him leave as soon as the Border Patrol dog found "nothing solid."  It's true that when the dog sniffed the F-150, the handler reported that the dog, which reacted only to contraband, "alert[ed], but nothing solid."  Agent Garcia testified that he thought the dog had alerted to residual odors—that "something may have been in [the F-150] at some point in time previously [or] recently" or that at "some other time there may or may not have been something that came in contact with that vehicle that would cause a K-9 to alert."  Ignoring Agent's Garcia's testimony, Escamilla contends that the dog sniff unequivocally "dispelled suspicion" that he had drugs in the F-150.

After stopping Escamilla, the Border Patrol agents continued to amass suspicion that he was involved in smuggling.[5]  Although the Border Patrol

---

[5] For example, when the agents stopped Escamilla, the F-250 immediately sped away, leading the agents "to believe that it could have been either loaded with narcotics or [undocumented immigrants.]"  *Cf. Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (holding that unprovoked flight in an area of heavy drug trafficking justified officers' reasonable suspicion).  The F-150 Escamilla drove was unusually clean, unlike typical oil company trucks.  *See Nichols*, 142 F.3d at 866 (noting that a car's "uncharacteristic[] clean[liness]" contributed to reasonable suspicion).  It also lacked tools or other common cargo.  *See id.* at 863 (noting that agents stopped a truck after noticing that it "carried no tools or pipe racks typical of oil field trucks").  The fuel cell in the bed of the F-150 also looked out of place and was unusable, and smugglers often fill modified or "fake" fuel cells with drugs.  *See United States v. Estrada*, 459 F.3d 627, 632 (5th Cir. 2006) (highlighting an officer's observation that the defendant's fuel tank looked "out of the ordinary" as if it "had been tampered with").  Escamilla, who had "a narcotics case" on his record, seemed nervous when he told the agents he worked for "Valdez," but could not elaborate, and the agents did not recognize the name.  *See Pack*, 612 F.3d at 355 (noting "nervousness" and "inconsistent stories" can contribute to reasonable suspicion); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) (noting that a prior arrest for drug trafficking contributed to reasonable suspicion).  And Escamilla's "work" clothes, both on his person and in his vehicle, did not bear any company logos and were unusually clean, like his truck.  *See Inocencio*, 40 F.3d at 720 ("[A]lthough [the defendant] appeared to be dressed as a workman, his clothing appeared too clean to have been working in the field.").

dog's sniff did not indisputably confirm the agents' suspicion by revealing hidden contraband, neither did the sniff dispel suspicion, contrary to Escamilla's suggestion. *Cf. Pack*, 612 F.3d at 357 ("[P]olice do not have to observe the equivalent of direct evidence of a particular specific crime . . . to detain a lawfully stopped individual to investigate where there is reasonable suspicion of criminal activity . . . ."). The dog "alert[ed]" in a way that led the agents to believe the F-150 had recently carried or been near contraband—a fact consistent with their suspicion that it served as a "scout" or "disturbance" vehicle for another car, which still constitutes criminal activity. *Cf. Florida v. Harris*, 133 S. Ct. 1050, 1056 n.2 (2013) ("A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone . . . ."). Further, the overall stop—justified by suspicion of smuggling, rather than a mere traffic violation—lasted no more than twenty-four minutes. Consequently, any delay between the agents' completing the dog sniff and arresting Escamilla after Border Patrol Agent Jennings found drugs in the F-250 was reasonable. *See Pack*, 612 F.3d at 361-62 (holding that a thirty-five-minute stop was constitutionally reasonable).

C

Escamilla next argues that he did not voluntarily consent to Agent Garcia's request to search the cell phone he had with him during the Border Patrol agents' investigatory stop. To determine whether a person's consent is voluntary, we consider six factors: (1) the voluntariness of the suspect's custodial status; (2) the presence of coercive police procedures; (3) the nature and extent of the suspect's cooperation; (4) the suspect's awareness of his right to refuse consent; (5) the suspect's education and intelligence; and (6) the suspect's belief that no incriminating evidence will be found. *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011).

The district court weighed each factor and concluded that under the

totality of the circumstances Escamilla's consent was voluntary. Relying primarily on out-of-circuit precedent, Escamilla argues that the district court incorrectly weighed factors two, three, and six in favor of the Government. He emphasizes that the circumstances were coercive because he was "alone and detained by two armed U.S. Border Patrol agents . . . on a secluded road while it was still dark" and unaware of his *Miranda* rights.[6] Escamilla also contends that he was essentially uncooperative because he did not "admit[] his involvement in criminal activity before consenting" or "assist agents in their search." In addition, he argues that the district court erroneously inferred that he did not believe police would find incriminating evidence on his phone even though the limited number of contacts with "obscure designations" would surely rouse Agent Garcia's suspicion.

Viewing the evidence *collectively* and in a light most favorable to the Government, the district court's findings of fact are not clearly erroneous, and its conclusion that Escamilla voluntarily consented is sound. As Escamilla admits, "[t]here is no '*Miranda* requirement' attending a simple request for permission to search." *United States v. Arias-Robles*, 477 F.3d 245, 250 (5th Cir. 2007). Further, "the mere presence of armed officers does not render a situation coercive." *United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011) (unpublished); *see, e.g.*, *United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008) (finding no coercion when "police did not have their weapons drawn"). There is no evidence that Agent Garcia or Agent Freed in any way threatened Escamilla; indeed, both agents specifically testified to the contrary. *See Mata*, 517 F.3d at 291 (finding voluntary consent when "no officer threatened or yelled at [the defendant] or 'treated him rudely'"); *United States*

---

[6] Escamilla also emphasizes that the agents did not inform him of his right to refuse consent, but the district court correctly considered this fact in its totality-of-the-circumstances analysis.

No. 16-40333

*v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997) (emphasizing that officers did not use threats, violence, or "overt[ly] display [their] authority").

According to the uncontested evidence, Agent Garcia simply asked "do you mind if I look through your phone?[,]" and Escamilla handed it over. We have recognized that consent "can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent." *Martinez*, 410 F. App'x at 763. Escamilla's conduct here constitutes more than mere silence or failure to object—he actively complied with Agent Garcia's request by handing the phone directly to him. *See United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995) (finding "clear cooperation" when a defendant "produced his ticket when requested" and "stood up voluntarily prior to the pat-down"); *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994) ("[I]t is settled law that the act of handing over one's car keys, if uncoerced, may in itself support an inference of consent to search the vehicle."). Accordingly, Escamilla voluntarily consented to Agent Garcia's search of the phone.

D

Escamilla also challenges Agent Antonelli's two post-arrest searches of the phone. Shortly after meeting Escamilla and the Border Patrol agents at the station, Agent Antonelli first manually searched the phone to determine its contact number so that he could request its call records. Escamilla then refused to claim the phone, specifically saying that it did not belong to him and leaving the phone with Agent Antonelli and his partner before going to jail. Five days later, Agent Antonelli searched the phone a second time using the forensic examination program Cellebrite.

1

The district court held that Escamilla's consent, given during the Border Patrol agents' vehicle stop, encompassed Agent Antonelli's manual search because Escamilla never revoked his consent or indicated that he did not

13

permit Agent Antonelli to search the phone.  In reaching its conclusion, the district court relied on its understanding that "Agent Garcia kept Defendant's phone after Defendant handed it to him"—an assertion plainly contradicted by the record.  Agent Garcia specifically testified that "after [he] searched that telephone . . . [he] gave it back to [Escamilla] upon being done with it."  This undisputed fact leads us to a different conclusion.

When the Government relies on consent as the basis for a warrantless search, officers "have no more authority than they have apparently been given by the consent." *Zavala*, 541 F.3d at 576 (quoting *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 666 (5th Cir. 2003)).  We measure the scope of a person's consent by what is objectively reasonable: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  "Thus, it is 'important to take account of any express or implied limitations . . . attending that consent which establish the permissible scope of the search in terms of . . . time, duration, area, or intensity.'" *United States v. Cotton*, 722 F.3d 271, 275 (5th Cir. 2013) (quoting 4 Wayne R. LaFave, Search and Seizure § 8.1(c) (5th ed. 2012)).

Here, Escamilla silently consented to Agent Garcia's "look[ing] through" his phone during the stop at the ranch by handing his phone directly to the agent.  It's true that as Agent Garcia searched the phone, Escamilla never "revoke[d] his consent," said "not to look through his phone," or otherwise *verbally* limited the scope of the consensual search.  But after viewing the limited information on the phone, Agent Garcia "gave it back to [Escamilla] upon being done with it."  Roughly four hours later and after Escamilla's arrest, Agent Antonelli searched the phone again.  The Government argues that this search was justified by Escamilla's earlier, "general and unrevoked" consent.  But as we have explained:

[A] defendant's failure to object after giving his *general* authorization to search might indicate that a search, later challenged as outside the scope of consent, was actually within it. But any failure to object "should not be treated as *expanding* a more limited consent, especially when the circumstances suggest some other possible reason for [the] defendant's silence."

*Cotton*, 722 F.3d at 278 (footnotes omitted) (quoting LaFave, *supra* at § 8.1(c)).

The facts surrounding Agent Garcia's search establish an implied limit to Escamilla's consent. Just as Escamilla's directly handing Agent Garcia the phone initiated the consensual search, a reasonable person would understand that Agent Garcia's directly handing the phone back to Escamilla ended it. Agent Garcia's search during the stop was one, complete search, and Agent Antonelli's search at the station was a second, distinct search requiring a warrant, its own consent, or some other exception to the warrant requirement. *See* LaFave, *supra* at § 8.1(c) (noting that when a reasonable person consents to a search, he or she may understand that "the search will be conducted forthwith and that only a single search will be made"). When the facts and circumstances surrounding a person's consent suggest a natural end to the consensual exchange with law enforcement, officers should not view the earlier consent as "authorizing a second search at some future time if the first search is not fruitful." *Id.* Because it is undisputed that Agent Antonelli did not have a warrant and the Government does not offer any other exception to the Fourth Amendment's usual warrant requirement to justify his search, we find that Agent Antonelli's post-arrest manual search of the phone at the Border Patrol station was unconstitutional, and the district court should have suppressed the evidence linked to this search. *See Riley v. California*, 134 S. Ct. 2473, 2495 (2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.").

No. 16-40333

2

Regarding Agent Antonelli's days-later Cellebrite search—another distinct search—the district court held that Escamilla abandoned any privacy interest he had in the phone and therefore could not challenge this search. We agree.

As a general rule, "Fourth Amendment rights are personal[,]" and "may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Accordingly, "a person has no standing to challenge a search or seizure of property that was voluntarily abandoned." *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013). In *Powell*, police searched defendants Booker Powell and April Akin's car for evidence of drug trafficking. *Id.* at 367-68. The officers heard ringing during the search and discovered a phone near the driver's seat. *Id.* at 368. "Powell denied the phone was his," and "Akin said that it belonged to Powell." *Id.* at 374. We held that by "disclaim[ing] personal connection to the phone," Akin abandoned it, which deprived her of standing to challenge the admissibility of the phone and its records.[7] *Id.*

Like the defendant in *Powell*, Escamilla expressly disclaimed ownership of the phone and left it in the possession of DEA agents. By doing so, Escamilla abandoned the phone and has no standing to challenge Agent Antonelli's Cellebrite search. Escamilla's reliance on a single out-of-circuit case, decided

---

[7] At oral argument, Escamilla's counsel heavily emphasized our decision in *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007), asserting that it supports his argument that Escamilla has standing to challenge the Cellebrite search. *Finley* explains a non-controversial point: a person need not own a thing to have a reasonable expectation of privacy in it. In *Finley*, we held that the defendant's possession and use of a phone officially owned by a business was sufficient to give him a reasonable expectation of privacy in the phone and standing to challenge its search. *Id.* at 259. The issue here, however, is one not addressed in *Finley*: whether a person who voluntarily disclaims a thing gives up any interest he once had in it (say, because of his possession and use) and, as a result, *no longer* has standing to challenge its search. *Powell* answers this question affirmatively.

No. 16-40333

before *Powell*, is misplaced.[8]

E

Because we find that Agent Antonelli's manual search of the phone recovered from Escamilla was unconstitutional, we must address whether the Government's reliance at trial on unconstitutionally obtained evidence, the phone's contact number and AT&T records, was harmless. In other words, we must determine whether the district court's admitting this evidence contributed to the jury's verdict. *Zavala*, 541 F.3d at 581 (citing *Neder v. United States*, 527 U.S. 1, 15 (1999)). Harmless error review is thus "fact-specific and record-intensive," requiring a close look at the trial proceedings. *United States v. El-Mezain*, 664 F.3d 467, 526 (5th Cir. 2011).

At trial, the Government introduced the phone's contact number and the accompanying call records to connect Escamilla to the driver of the F-250, who actually possessed marijuana and heroin, and thus to the drug conspiracy. Relying on these records, Agent Antonelli testified about the frequency of communication between the phone recovered from Escamilla and the broken phone recovered from the F-250. Specifically, he testified that the two phones called each other 196 times and texted 29 times in the month before Escamilla's arrest.

Two facts are fatal to Escamilla's argument that the unconstitutionally obtained evidence contributed to the jury's guilty verdict. First, Escamilla has

---

[8] Escamilla relies on *United States v. Lopez-Cruz*, in which the defendant told an officer that the car he was driving and two phones in the console "belonged to a friend." 730 F.3d 803, 805-06 (9th Cir. 2013). The Ninth Circuit held that the defendant had standing to challenge a search of the phones because the court had never held that "mere disavowal of ownership, without more constitutes abandonment." *Id.* at 809. Specifically, the court explained that this case "involves only [the defendant's] response to the agent's question as to whether the phones were his rather than any affirmative denial of any association with the phones." *Id.* Here, Escamilla more than "mere[ly] disavowed" ownership of the phone; he simultaneously left it with two DEA agents who, believing it belonged to Escamilla, tried to return it to him so it could be kept with his other belongings in jail.

not challenged the manual search of *the other phone*, which led to Agent Antonelli receiving records detailing any calls and texts to or from that phone. Unsurprisingly, these records reflect the same 196 phone calls and 29 text messages between the broken phone recovered from the F-250 and the phone recovered from Escamilla, identified in the records by its contact number. As Escamilla points out, these records are helpful only if the Government knows the number associated with the phone recovered from Escamilla, which it originally learned from the unconstitutional search. But at oral argument, Escamilla's counsel candidly admitted that the Cellebrite search, which Escamilla lacks standing to challenge, also revealed the phone's contact number.[9] With this knowledge of the phone number associated with Escamilla, the jury could have connected him to the F-250 based on only the AT&T records from the broken phone. Consequently, the unconstitutionally obtained evidence that Escamilla argues is harmful merely duplicates other evidence in the trial record.

Second, the Government introduced evidence other than the phone records that connected Escamilla to the F-250. For example, Agent Antonelli testified that, after Escamilla's arrest, agents discovered that the F-150 Escamilla drove and the abandoned F-250 carrying the drugs contained identical items, such as the same brand of generic work vests and air fresheners, which substantiated the Border Patrol agents' "clone" theory. Specifically, a right-handed glove found in the F-250 was the same brand and size as a left-handed glove found in the F-150. The Government also introduced a recording and a transcript of a conversation between Escamilla, while in prison, and his girlfriend, Monica Ortiz, that demonstrates his

---

[9] The record supports counsel's concession. At Escamilla's suppression hearing, Agent Antonelli testified that the Cellebrite search of the phone taken from Escamilla identified the phone number, the phone's contact list, and any recent calls.

knowledge of the drug conspiracy. Escamilla told Ortiz that the person in the F-250 "left the f***ing chip [from the broken phone] behind" and "should have taken it with him." Escamilla also admitted to erasing the calls on the phone in his possession before encountering the Border Patrol agents. All of this evidence incriminates Escamilla. We therefore find that erroneously admitting the evidence derived from the unconstitutional search was harmless. *See El-Mezain*, 664 F.3d at 526 ("[E]rror in admitting evidence [is] harmless when the evidence is cumulative, meaning that substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence.").

IV

In sum, we hold that all of the Border Patrol agents' conduct was constitutional and that Escamilla voluntarily consented to a search of the phone in his possession during the lawful vehicle stop. Because Border Patrol Agent Garcia completed his consensual search of the phone and returned it to Escamilla, DEA Agent Antonelli's post-arrest manual search of the phone at the Border Patrol station was a distinct search, requiring independent justification. Without it, Agent Antonelli's search was unconstitutional. Nonetheless, because the Government discovered the same evidence from Agent Antonelli's manual search of the broken phone from the F-250 and the Cellebrite search of the phone recovered from Escamilla after he abandoned it, the relevant evidence obtained from the unconstitutional search was merely duplicative of other admissible evidence in the trial record. Accordingly, we affirm the judgment of the district court because the error was harmless.