**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

August 17, 2020

Lyle W. Cayce
Clerk

No. 19-20427

UNITED STATES OF AMERICA,

    Plaintiff - Appellant

v.

CRISTOFER JOSE GALLEGOS-ESPINAL,

    Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GRAVES, and DUNCAN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Department of Homeland Security (DHS) suspected Cristofer Gallegos-Espinal (Gallegos) of participating in his mother's alien-smuggling conspiracy. But when federal agents persuaded Gallegos voluntarily to consent to a thorough search of his iPhone, they discovered evidence of an unrelated crime: possession of child pornography. This discovery led to a three-count indictment charging Gallegos with sex offenses with a minor and destruction of evidence. In the pretrial proceedings below, the district court suppressed three incriminating videos that the government discovered in the course of an examination of extracted data from Gallegos's iPhone. The court

No. 19-20427

ruled that Gallegos's written consent to a "complete search" of the iPhone could not support a review of extracted data three days after the phone was returned.

The government has filed this interlocutory appeal, under 18 U.S.C. § 3731, challenging the district court's suppression ruling. Because Gallegos signed a consent form that, in its broad terms, encompasses the search and seizure conducted, and because Gallegos failed affirmatively to limit the scope of his broad consent, we reverse and vacate the district court's suppression of evidence and remand for further proceedings not inconsistent with this opinion.

I.

On September 19, 2017, DHS agents closed in on Aleida Ruedo Espinal (Aleida), one of the primary targets of an alien-smuggling investigation. When the agents arrested Aleida and searched her home, she requested that her minor children be left in the custody of her adult son, defendant Cristofer Gallegos-Espinal. The agents quickly obliged. Gallegos was a secondary target in their alien-smuggling investigation, so Aleida's request presented an opportunity to look for evidence tying Gallegos to his mother's smuggling operation.

When Gallegos arrived at the scene, about twenty law enforcement officers were there to greet him. Agents conducted a pat down for officer safety, and then searched Gallegos's vehicle for weapons. These initial searches did not uncover any weapons or other contraband. Gallegos, however, was in possession of a gray Samsung cell phone. No contraband having been found, Gallegos was permitted to enter his mother's house, where he was introduced to Case Agent Richard Newman. Agent Newman explained to Gallegos that he had been called to the scene because his mother had requested that he take custody of his younger siblings.

No. 19-20427

Agent Newman testified that when he first spoke to Gallegos his goal was to review Gallegos's gray Samsung. He wanted to look for certain banking information because he suspected that Gallegos was a "financial facilitator" in his mother's alien-smuggling network. At the same time, he also wanted to make sure not to tip Gallegos off to his suspicions. So, he decided to "use an absurd example of why [he] wanted to [see the] phone." He suggested that, before Gallegos could take custody of a minor child, he and the other agents would need to search Gallegos's vehicle a second time for "something illegal" and also "look through [Gallegos's] phone to make sure [there was not] any child pornography on it." This "absurd example" brought on a chuckle from Gallegos and a few of the agents in the vicinity, apparently because Gallegos believed (and the agents pretended to believe) that the search of the cell phone was a frivolous formality.[1]

Gallegos agreed to the requested searches of his vehicle and gray Samsung, and in each case his consent was registered both orally and in writing. The written document reflecting Gallegos's consent, which was signed by Gallegos, was a standard consent form. The consent authorized "a complete search of [Gallegos's] Phone & car." In addition to a "complete search," the consent further authorized a seizure: specifically, it permitted agents to "take any letters, papers, materials, or other property which they may desire to examine." Finally, the signed consent form put Gallegos on notice that a search or seizure might produce evidence that could be used against him in a later criminal proceeding.[2]

---

[1] The deceit of the agents, however, has not been raised as a challenge to the voluntariness of the consent.

[2] The generic consent form used by the agents is the standard form commonly used in similar circumstances. The agents admit that they intentionally used this generic form, rather than a more specific one, because the generic form was more likely to induce consent and less likely to draw an objection.

At this point, the investigation began to occur simultaneously on two fronts. Agent Newman and others remained in Aleida's house and started to search the gray Samsung. Other agents, having received Gallegos's consent for a thorough search of the vehicle, left the house and returned to the vehicle to begin that search.

We turn first to the search of the gray Samsung, which occurred in Aleida's kitchen. One of the agents hooked the phone up to an electronic extracting device called a "Cellebrite" to extract (*i.e.*, copy) its data. At some point, Gallegos observed the Cellebrite extraction taking place. In fact, he sat at the table where the extraction was taking place and could see clearly the agents connecting wires from the Cellebrite to the gray Samsung. It is clear that, at that point, he knew more than a "look through" was occurring, but he still made no objection or comment.

While the gray Samsung was connected to the Cellebrite, some of the agents were outside conducting the second vehicle search. Although the signed consent form initially identified only Gallegos's vehicle and gray Samsung as the property subject to search, these agents soon discovered a second cell phone (a white iPhone). Gallegos orally consented to a search of the iPhone, which was then inserted into the form. Gallegos does not challenge the validity of this amendment of the consent form. The agents' testimony suggests that, after giving consent to search the iPhone orally, Gallegos personally wrote the iPhone's twelve-digit passcode onto the consent form that he had earlier signed. Gallegos remembers it differently, but he does not deny providing the passcode. According to his declaration, Gallegos orally gave the passcode to the agents and watched as an agent added the passcode to the consent form, to which he made no comment. In any event, the agents were given the passcode, the consent form was modified to include the iPhone, and the phone was seized, without objection from Gallegos, for a later inspection.

Meanwhile, back in the kitchen, the extraction of the gray Samsung was nearing completion. The extraction had lasted more than forty-five minutes, and a visual display on the Cellebrite's screen had tracked the progress of the download, which Gallegos had observed in part. The download was a "logical extraction," which means that the Cellebrite copied only data that would be visible during a manual search of the phone. By contrast, a "physical" extraction would have downloaded deleted data as well.

When the agents finished their logical extraction of the gray Samsung, they asked Gallegos to accompany them to the Homeland Security Investigations building in Houston for an interview about his mother's smuggling activities. At this point, the agents were in possession of both phones: the gray Samsung and the white iPhone. Once at the office, the iPhone, which had not yet been examined, was subjected to a logical extraction, but not in Gallegos's presence. After the interview was over, the agents returned both the Samsung and the iPhone to Gallegos—meaning that the phones were returned on the same day that they were consensually seized.

At this point, it should be noted that the gray Samsung is not involved in this appeal. No search of the Samsung produced evidence relevant to this case.

The white iPhone is the focus of this appeal. Three days after the logical extraction, an examination of that data taken from the iPhone showed that Gallegos was in possession of child pornography. In the iPhone's photo gallery, Gallegos had stored (without deleting) three videos depicting his sexual abuse of a young girl, whom Gallegos identifies as his "young minor sister." These images would have been accessible to an agent conducting a manual search of the iPhone. When the pornographic videos were discovered, the case was reassigned to agents with more experience in child pornography cases, including Special Agent Richard Wilfong, a specialist in cyber investigations.

No. 19-20427

Special Agent Wilfong applied for a warrant to search Gallegos's iPhone and to further probe its data. He testified that his purpose in seeking a warrant was to determine "where the videos were created" and to "see if [they] had been distributed anywhere." When it came time to execute the warrant on Gallegos's iPhone (which had been returned to him on the day it was searched), Wilfong's team located Gallegos and asked him where his phone was. He told them that it was at his aunt's house, but that turned out not to be true. Eventually, Gallegos met the agents at his aunt's house, with the iPhone in his possession, and told them that he forgot he had left the phone in his car. The phone was handed over, but the agents soon discovered that it had been restored to factory settings and that its incriminating videos had been erased.[3] As far as the record shows, no additional evidence of child pornography was discovered on the device.

## II.

The government's investigation ultimately produced a three-count indictment charging Gallegos with sexual exploitation of a child under 18 U.S.C. § 2251, possession of child pornography under 18 U.S.C. § 2252A, and destruction of property under 18 U.S.C. § 2232. Following the indictment, Gallegos moved to suppress "all data downloaded from [his] Iphone," including the three incriminating videos. He argued that investigators had violated the Fourth Amendment in several ways, including by eliciting involuntary consent, by exceeding the scope of any consent given, and by relying on a deficient search warrant. The court held a two-day suppression hearing to resolve the motion.

---

[3] The videos in question would no longer have been accessible during a manual search or logical extraction, but they would have been recoverable during a physical extraction.

No. 19-20427

The district court disagreed with most of Gallegos's arguments for suppression, including his arguments concerning voluntariness and the alleged deficiency of the search warrant. Furthermore, the court rejected Gallegos's argument that the Cellebrite extraction of his data was beyond the scope of his consent, holding that under the circumstances "a reasonable person would have believed his [iPhone] data was being downloaded, and . . . it was Gallegos's responsibility to limit the scope of consent to a manual search." But the forensic examination of extracted data—which occurred after the iPhone was returned to Gallegos—was a different matter. The district court held that the government's review of extracted data occurred too long after Gallegos's "cell phones were returned to his physical possession and he was no longer going to be taking custody of his siblings." This timely government appeal followed.

III.

The sole issue in this interlocutory appeal is whether the government exceeded the scope of Gallegos's consent by reviewing extracted evidence after the iPhone was returned and before a search warrant was obtained, notwithstanding the broad terms of Gallegos's consent to search the phone.[4] "[T]he scope of consent to a search is a question of law that we review de novo." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014). "Where there is ambiguity regarding the scope of a consent, the defendant has the

---

[4] At times, Gallegos appears to make other arguments, *e.g.*, arguments concerning the good-faith exception to the exclusionary rule. But only one issue, the scope of his consent, has been raised by the appellant or adequately briefed by the parties, so only that issue is before us on appeal. *See Edmond v. Collins*, 8 F.3d 290, 292 n.5 (5th Cir. 1993) ("On appeal, we do not review issues not briefed."). We also reiterate that Gallegos has expressly disclaimed any challenge to the district court's conclusion that his consent was voluntary.

responsibility to affirmatively limit its scope." *United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 2019).

The Supreme Court's standard for measuring the scope of a consent is one "of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991).  Although this standard focuses on the term "exchange," which usually occurs orally between the parties at the scene of the event, we have previously applied it to written consents.  *United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995).   The question that will resolve this appeal is thus framed: how would a typical reasonable person interpret the written consent? *See United States v. Starr*, 533 F.3d 985, 995–96 (8th Cir. 2008).  Even though that is a question of law, "factual circumstances are highly relevant when determining what [a] reasonable person would have believed to be the outer bounds of the consent that was given." *United States v. Mendez*, 431 F.3d 420, 426 (5th Cir. 2005) (quoting *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003)).  For that reason, we "take account of any express or implied limitations or qualifications attending . . . consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity." *United States v. Cotton*, 722 F.3d 271, 275 (5th Cir. 2013) (quoting 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.1(c) (5th ed. 2012)).

Turning to the present case, we begin by examining the totality of the circumstances surrounding Gallegos's consent.    The record shows that Gallegos first consented orally and that his oral consent was then "reduce[d] . . . to writing."  To reduce the earlier oral consent to writing, agents had Gallegos personally execute a written agreement laying out the scope of his

consent. Without a doubt, the terms of this written consent are broad.[5] The agreement authorized "complete" searches of Gallegos's vehicle and gray Samsung; it also permitted the seizure of "any letters, papers, materials, or other property which [the agents] may desire to examine." Furthermore, the agreement directly and unambiguously contemplated the search of a *cell phone*, *i.e.*, an electronic device packed with personal information. Here, it can be reasonably assumed that Gallegos knew that the contents of his phone would be the subject of the search. One agent even testified that Gallegos *personally* wrote "gray Samsung" into the agreement, and Gallegos's declaration does not contradict such testimony. Finally, as previously noted, Gallegos does not dispute that the original agreement was validly amended to encompass the iPhone. Nor does he challenge the conclusion that, after the written amendment to the consent, the iPhone could be searched on the same terms as the Samsung and the vehicle, the two original subjects of the consent agreement.

The record thus establishes that Gallegos's consent is reliably reflected in the terms of the written consent agreement, which relate directly to the property at issue (Gallegos's white iPhone). Our task is simply to apply the terms of the agreement as a typical reasonable person would understand those terms. *Jimeno*, 500 U.S. at 250–51.

---

[5] The consent agreement reads in full: "I, Cristofer Gallegos, have been informed by U.S. Immigration and Customs Enforcement (ICE) Special Agent Newman of my right to refuse to consent to a search of my property, described as . . . Car Scion XD 2008 + Gray Samsung and White Iphone [with omitted passcode]. I have also been advised by ICE Special Agent Newman that, if I voluntarily consent to a search of this property, anything discovered during this search may be used against me in any criminal, civil, or administrative proceedings. I have decided to allow ICE Special Agents Newman and Cardenas (BPA) to conduct a complete search of my Phone + car, located at [address omitted]. These ICE Special Agents are authorized by me to take any letters, papers, materials, or other property which they may desire to examine. I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion, or other intimidation. I have read the above statement and understand my rights."

No. 19-20427

So, turning to that task, we emphasize again that the terms of the agreement are plainly broad. The agreement includes consent for a "complete" search and a seizure of "any . . . property." Applying the terms as written, we are compelled to conclude that the search did not exceed the scope of consent by extracting the iPhone's data or in later reviewing it. *Cf. United States v. Roberts*, 274 F.3d 1007, 1016 (5th Cir. 2001) (agreeing that digital evidence of child pornography was within the scope of a nearly identical consent agreement). No aspect of the search fell outside the range of conduct that a typical reasonable person would expect from a "complete" iPhone search or from the subsequent seizure of any "materials . . . which [the government] may desire to examine." A typical reasonable owner of a cell phone would know that a cell phone contains extensive personal information and would understand that a "complete" cell phone search refers not just to a physical examination of the phone, but further contemplates an inspection of the phone's "complete" contents. A typical reasonable owner of a cell phone would also realize that permission to seize "materials" includes permission to seize (and examine) such information. *See Material*, OXFORD ENGLISH DICTIONARY (3d ed. 2001) (defining "material" to mean "[t]ext or images in printed or electronic form").

Gallegos proffers a few reasons to depart from the plainly broad terms of the consent form, but none is convincing.[6] We thus hold that the government's

---

[6] For example, Gallegos argues that the consent agreement should not be construed to expand upon his earlier oral consent. This argument, however, has no weight where Gallegos voluntarily signed a written consent agreement and failed affirmatively to limit the agreement's breadth. *Mendez*, 431 F.3d at 427 ("It is the defendant's responsibility to limit the scope of the search if he so intends."); *Sarli*, 913 F.3d at 495.

Gallegos further contends that our decision in *United States v. Escamilla*, 852 F.3d 474 (5th Cir. 2017), controls the outcome here. *Escamilla*, however, is inapposite because *Escamilla* did not feature *any* written consent agreement. *See id.* at 484–85. The uncontested oral and written consent here stand in overwhelming contrast to the limited consent obtained in *Escamilla*, which was simply implied from the fact that the suspect

No. 19-20427

extraction of data and later review of that data did not exceed the scope of consent as plainly, unmistakably, and voluntarily set out in the consent agreement. Because the scope of consent was the only basis for evidentiary suppression argued on appeal, we hold that the district court's suppression of evidence was reversible error.

## IV.

To sum up: the only issue presented by this appeal concerns the scope of Gallegos's consent. The consent was broad—broad enough fairly to cover the search and seizure of cell phone data that occurred here. Although Gallegos urges us to disregard or modify the broad terms of his voluntary consent, he has offered no persuasive reason for our doing so.

Accordingly, the district court's suppression order is REVERSED and VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.

REVERSED, VACATED, and REMANDED.

---

handed over his phone when an agent requested it. *Id.* Neither does *Escamilla* stand for the blanket proposition that the return of a consensually searched cell phone categorically bars a further review of data taken from the phone during the search. The permissibility of such a review turns on the consent obtained. Here, a later review of extracted data comports with written language in the consent agreement authorizing a "complete" search of the iPhone and a seizure of any "materials . . . which [the agents] may desire to examine."

Further, citing our decision in *SEC* v. *ESM Gov't Sec., Inc.*, 645 F.2d 310 (5th Cir. 1981), Gallegos appears to argue that the terms of his consent should be disregarded because they were induced by deception. But on appeal Gallegos does not challenge the district court's conclusion that, notwithstanding the deception, his consent was voluntary.

Finally, Gallegos repeatedly implies that some limitation should be grafted onto the broad terms of the consent agreement because cell phone searches implicate important privacy interests. *Cf. Riley v. California*, 573 U.S. 373, 386 (2014). But the admitted importance of the privacy interest at stake does not override our basic task, which is to interpret, as a typical reasonable person would, the broad, voluntary, and undisputed consent actually given by Gallegos. We have tried to do that in the analysis above.

No. 19-20427

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

The majority concludes that Defendant Cristofer Gallegos-Espinal "signed a consent form that, in its broad terms, encompasses the search and seizure conducted" and "failed affirmatively to limit the scope of his broad consent." Because the consent form insufficiently explained that the iPhone's data would be extracted for later review and because the Cellebrite iPhone extraction occurred outside of Gallegos-Espinal's presence, I respectfully dissent.

As Justice Scalia wrote, "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo v. United States,* 533 U.S. 27, 33-34 (2001); *see also Riley v. California,* 573 U.S. 373, 407 (2014) (Alito, J., concurring in part and concurring in the judgment) ("Many cell phones now in use are capable of storing and accessing a quantity of information, some highly personal, that no person would ever have had on his person in hard-copy form. This calls for a new balancing of law enforcement and privacy interests.").

"Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Riley,* 573 U.S. at 393. "The sum of an individual's private life [on a cell phone] can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." *Id.* at 394.

The question before us is whether Gallegos-Espinal's consent– specifically his verbal consent for agents to "look through" a cellphone; a written consent on a generic, outdated consent form; and an implicit (and arguably uninformed) consent to a Cellebrite iPhone search—allowed the government to extract a duplicate copy of his iPhone contents for a subsequent forensic review at a later time.

No. 19-20427

Of course, we measure the scope of a person's consent by "objective reasonableness"—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The test of *reasonableness* under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (emphasis added). If the suspect's "consent would reasonably be understood to extend to [holding onto the copied contents of a cellphone], the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Jimeno*, 500 U.S. at 252.

The defendant has the responsibility to limit the scope of his consent, *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003), and clear up any "ambiguity regarding the scope of a consent," *United States v. Sarli,* 913 F.3d 491, 495 (5th Cir.), *cert. denied,* 139 S. Ct. 1584 (2019). "Thus, it is 'important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of . . . time, duration, area, or intensity.'" *United States v. Cotton,* 722 F.3d 271, 275 (5th Cir. 2013) (citation omitted). "[A]ny failure to object 'should not be treated as expanding a more limited consent, especially when the circumstances suggest some other possible reason for defendant's silence.'" *Cotton*, 722 F.3d at 278 (footnotes omitted).

Here, the generic consent form only specified that agents can "take any letters, papers, materials, or other property which they may desire to examine." Today's decision requires the average person to make the inferential leap that "property" refers to your digital content, including text messages, photos, Google Maps locations, bank account statements, and even your highest score on Candy Crush.

Turning to the totality of circumstances, we examine the Cellebrite device connected to Gallegos-Espinal's phones:

13

No. 19-20427





**Government Exhibit 4**                    **Government Exhibit 3**

According to the agents, the Cellebrite extraction device looks like a "suitcase" connected to a "power outlet" with various "cables" and a screen displaying a bar to indicate "a countdown, like an hour and 30 minutes, as it's extracting the information." The agents noted that they did not manually thumb through the Samsung as it was connected to the Cellebrite machine. *Id*. One agent explained that he personally assumed that, "If a phone is hooked up to another machine, I don't know what else you could imagine is happening other than that [data] is being extracted. So, I assume [Gallegos-Espinal] knew that data was being transferred from his phone to the machine; but I don't know."

However, when agents took the white iPhone, Gallegos-Espinal gave the agents his iPhone's passcode, an indication that he believed agents would manually thumb through any evidence on the iPhone. The incriminating evidence was stored in the iPhone's photo gallery and not deleted, so Gallegos-Espinal knew that the agent *might* come across these photos or videos while manually scrolling through the iPhone.

After the Cellebrite extraction of the Samsung was completed, Gallegos-Espinal maintains that agents told him he needed to drive immediately to the agents' offices to retrieve his little brother or his brother would be turned over

14

to child protective services. Gallegos-Espinal agreed to go to the agent's office and drove his own vehicle to meet them. While agents interviewed Gallegos-Espinal at the office, the logical extraction of his iPhone took place in another room outside his presence.

In my view, Gallegos-Espinal's inability to see the Cellebrite extraction performed on his iPhone (as he previously saw on his Samsung phone) deprived him of having information necessary to make an expressed or implied limitation on the initial broad consent to search. We can only speculate as to whether Gallegos-Espinal would have limited the scope of the search had he witnessed his iPhone being plugged into the Cellebrite machine for data extraction. The general consent form was insufficient to alert Gallegos-Espinal that the government was going to extract and retain the iPhone data for later examination, especially when Gallegos-Espinal was told the phone searches were only needed to determine if he could take custody of his younger siblings. For these reasons, I would affirm the district court's suppression order.