**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HALEY OLSON, | No. 23-35365 |
| *Plaintiff-Appellant*, | D.C. No. 2:20-cv-01342-IM |
| v. | |
| COUNTY OF GRANT, a government entity; GLENN PALMER; JIM CARPENTER, | OPINION |
| *Defendants-Appellees*, | |
| and | |
| ABIGAIL MOBLEY, | |
| *Defendant*. | |

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted July 10, 2024
Seattle, Washington

Filed February 10, 2025

Before:  M. Margaret McKeown, Richard R. Clifton, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Bress

## SUMMARY[*]

### Fourth Amendment/Qualified Immunity

The panel affirmed the district court's summary judgment for law enforcement officials based on qualified immunity and lack of supervisory liability in Haley Olson's action alleging Fourth Amendment violations arising from the extraction of the contents of her phone without a warrant.

Olson was arrested in Idaho for marijuana possession and signed a form giving Idaho police consent to search her phone, who then created an "extraction," or copy, of her phone contents.  Defendant Glenn Palmer, then-Sheriff of Grant County, Oregon, heard about the Idaho arrest and, curious about whether Olson was romantically involved with Grant County Deputy Tyler Smith asked defendant Jim Carpenter, then-Grant County Attorney and County Prosecutor, to request the phone extraction from the Idaho prosecutor in Olson's case.  Carpenter requested and obtained the extraction and reviewed the contents before allegedly deleting the data.  However, Olson subsequently heard gossip around town about the contents of her phone,

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

including nude photos, all seemingly originating from the sheriff's office.  She sued Sheriff Palmer, County Prosecutor Carpenter, and Grant County, alleging, among other things, a Fourth Amendment violation.

The panel affirmed the district court's summary judgment for Sheriff Palmer for lack of supervisory liability because there was no evidence that Palmer reviewed the extraction or had any supervisory authority over Carpenter.  His request that Carpenter procure and review Olson's cell phone data failed to establish supervisory control.  The panel declined to impose supervisory liability for a constitutional violation where, at best, there was a cooperative relationship between colleagues.

The panel next agreed with the district court that Carpenter was entitled to qualified immunity because Olson's right to be free from Carpenter's search was not clearly established at the time.  The panel determined, however, that developing constitutional precedent in this area would be helpful, and, therefore, held that Carpenter's search infringed on Olson's Fourth Amendment rights. This case involved a law enforcement agency accessing highly sensitive cell phone data from another jurisdiction in the absence of a warrant, consent, or even any investigation or suspicion of criminal activity on the part of a suspect.  Olson was arrested in Idaho for possession of marijuana, which is not illegal in Oregon, and there was no reason for Palmer or Carpenter to suspect that Deputy Smith had taken part in criminal activity.  Olson's consent in Idaho did not extend to a search by a different law enforcement agency, in another state, and the search did not fall into any exception to the warrant requirement.

Concurring in part and concurring in the judgment, Judge Bress agreed that the claims against Sheriff Palmer failed because there was no evidence he exercised supervisory control over County Prosecutor Carpenter, and that Carpenter was entitled to qualified immunity because any constitutional violation was not clearly established. These points were sufficient to resolve this appeal, and Judge Bress would end the analysis there. This was not a case in which it would be helpful to the development of the law to answer the underlying constitutional question even when the defendant prevails on qualified immunity grounds.

## COUNSEL

Nadia H. Dahab (argued), Sugerman Dahab, Portland, Oregon; Meredith Holley, Eris Conflict Resolution, Eugene, Oregon; for Plaintiff-Appellant.

Carson L. Whitehead (argued), Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; Aaron P. Hisel (argued) and Rebeca A. Plaza, Capitol Legal Services, Salem, Oregon; for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

This appeal presents a scenario in which agencies from two different state jurisdictions shared a defendant's sensitive phone data without consent, without a warrant, and without any pending charges, or even an investigation by the out-of-state agency requesting access to the data. In January 2019, Haley Olson was arrested in Idaho for marijuana possession. Olson signed a form giving Idaho police consent to search her phone, and they created an "extraction," or copy, of her phone contents. During the search of her car, Idaho police found the business card of Tyler Smith, a Grant County, Oregon sheriff's deputy. Glenn Palmer, then-Sheriff of Grant County, Oregon, heard about the arrest and, out of "curiosity" about deputy Smith's connection to possible criminal activity, asked Jim Carpenter, then-Grant County Attorney and County Prosecutor, to request the phone extraction from the prosecutor in Olson's Idaho case. In Carpenter's telling, he reviewed Olson's phone data for evidence of criminal activity on Smith's part, found none, and deleted his copy of the extraction. But around town, Olson heard a different story: the contents of her phone— including intimate photos of Olson and Smith—were being passed around the sheriff's office.

Olson sued Palmer and Carpenter alleging, among other claims, Fourth Amendment violations. The district court granted summary judgment for Palmer for lack of supervisory liability, and for Carpenter on grounds of qualified immunity because his actions did not violate clearly established law.

We agree with the district court on the outcome and agree there was no clearly established law. We conclude, however, there was a constitutional violation. This case presents a troubling example of the intrusion on Fourth Amendment rights that can occur with respect to highly sensitive cell phone data. More specifically, this circumstance involved a law enforcement agency accessing highly sensitive cell phone data from another jurisdiction in the absence of a warrant, consent, or even any investigation or suspicion of criminal activity on the part of a suspect. Although we affirm the district court's grant of summary judgment because Olson's right to be free from Carpenter's search was not clearly established at the time, we take this opportunity to conclude that there was a constitutional violation.

## Background

On January 22, 2019, Olson, who runs a marijuana dispensary in Oregon, where marijuana is legal, was pulled over and arrested in Idaho for marijuana possession. During the stop, she told the officers that her boyfriend was a sheriff's deputy, and in her car, the officers found a business card for Tyler Smith, a sheriff's deputy in Grant County, Oregon. Following her arrest, Olson signed a consent form to allow Idaho police to search her cell phone. The form was titled, "Idaho State Police Voluntary Consent to Search." The consent "authorize[d] the Idaho State Police[] or its agent to conduct a search" of her phone, and advised that:

> You have certain rights under both the Idaho and United States Constitutions relative to your property. You are not required to consent to a search of your property and you have the absolute right to refuse to consent to

such a search. In the event you do consent to
such a search, any evidence found as a result
of such search could be taken and used
against you in Court.

Nothing in the consent form referenced transfer of
information to another jurisdiction. In fact, the form was
directed at evidence that "could be taken and used against
[Olson] in Court." The Idaho police then "extracted," or
copied over to their own computers, the contents of Olson's
cell phone for review. The Idaho charges against Olson were
later dropped.

Shortly after Olson's arrest, Grant County Sheriff Glenn
Palmer called the Idaho State trooper in charge of Olson's
case, who informed Palmer that Smith's card was found in
Olson's vehicle. Palmer apparently heard about Olson's
arrest from another employee at the sheriff's office, although
it is not clear from the record how the employee learned of
the arrest. Palmer—allegedly concerned that deputy Smith
might be involved in illegal activities with Olson that would
require an internal investigation—took two actions: First, he
requested Olson's phone extraction from the Idaho state
trooper and was rebuffed; and second, he asked Grant
County District Attorney Jim Carpenter to request and
review the extraction. Carpenter agreed to do so, ostensibly
to make sure that there was no *Brady* material that he would
have to disclose in cases where Smith might serve as a
prosecution witness. In his letter to the Idaho prosecutor,
Carpenter told her that the extraction "will be used only for
internal purposes and will not be disseminated to any other
agencies or third parties." The Idaho prosecutor sent
Carpenter a flash drive containing a copy of the extraction.

At no time did the Idaho State Police appoint the out-of-state authorities—or anyone else for that matter—as its agents.

Immediately contradicting his letter to the Idaho prosecutor, Carpenter first asked two outside agencies to review the extraction—the Oregon State Patrol and the Deschutes County Sheriff. Both agencies declined, as there was no ongoing or related criminal investigation. So, Carpenter reviewed the extraction himself. Concluding that the extraction showed an affair between Olson and Smith (including nude photos of both parties) but no criminal activity, Carpenter wrote Palmer a letter to that effect. Palmer claimed that Carpenter twice offered Palmer the chance to review the extraction, reporting that Carpenter said that "there were things on the cell phone that, 'once you see them, you can't unsee them.'" Palmer denies having ever reviewed the extraction or seen any nude photos of Olson, and Carpenter denies having ever offered to show the extraction to Palmer. Carpenter asserts that, immediately upon the conclusion of his review and his report to Palmer, he "reformatted" the flash drive, deleting the extraction.

Carpenter's claim of a fleeting and confined examination of the data is belied by Olson's testimony. In various encounters around town, Olson heard gossip regarding her arrest, her phone, her relationship with Smith, and nude photos, all seemingly originating from the sheriff's office. In the months following Olson's arrest, a friend of Palmer's came into the dispensary and told Olson that Palmer told him Olson had gotten arrested in Idaho, and that he "hear[d] they found a bunch of drug activity on [Olson's] phone." In July, a stranger wearing a sheriff's office uniform told Olson that he "heard there's some pretty smokin' pictures of you going around the sheriff's office." In August, a local resident pointed to Olson and called her "the drug dealer that likes to

fuck cops." Another witness observed a married couple—both themselves employees of the sheriff's office—looking at nude photos of Olson on the husband's phone.

In response to this information, Olson first filed a records request with the county. Carpenter responded that same day, explaining in a letter that: Palmer "advised" him to obtain the extraction and he did so; he could not find an outside agency willing to review the extraction; as a result, he "took a quick look at the flash drive;" and, upon finding no evidence of criminal activity and given that there was "content on the flash drive [that] was clearly personal in nature," he did a "complete re-format of the flash drive," thereby deleting its contents. In this letter, Carpenter insisted that he "was not willing to provide the flash drive to the Sheriff or any other local agency," which conflicts with Palmer's testimony that Carpenter offered to show him the extraction.

Olson sued Palmer, Carpenter, and Grant County, bringing Fourth Amendment claims[1] against Palmer and Carpenter, a *Monell* claim against Grant County, and a common-law intrusion upon seclusion claim against the county. The district court granted summary judgment for the defendants on all claims, holding that Olson had not made out a claim against Palmer, and that Carpenter was entitled to qualified immunity. Olson timely appealed the grants of summary judgment to Palmer and Carpenter.

---

[1] In Olson's complaint, these claims are characterized as Fourteenth Amendment claims for violation of Olson's right to privacy. Her attorney clarified in later correspondence that these are, in fact, Fourth Amendment claims.

## Analysis

### I. Supervisory Liability Under *Monell* (Palmer)

There is no respondeat superior liability under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978). Third parties, such as Sheriff Palmer, may not be held liable because they were merely present for a constitutional violation or working in the same or coordinating departments. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018). Instead, third parties may only be liable for the constitutional violations of others under Section 1983 if they are a supervisor, and "(1) [they were] personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists 'between the supervisor's wrongful conduct and the constitutional violation.'" *Id.* at 819–20 (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

Under this construct, which we review de novo, the claim against Sheriff Palmer is easily resolved. *Evans v. Skolnik*, 997 F.3d 1060, 1064 (9th Cir. 2021); *see also Hansen v. Black*, 885 F.2d 642, 643–44 (9th Cir. 1989) (reviewing de novo grant of summary judgment on supervisory liability grounds). While there is evidence that some of the contents of the phone extraction made their way to the sheriff's office, there is no evidence that Palmer reviewed the extraction himself. Nor does Olson present any evidence that Palmer had any supervisory authority over Carpenter in Carpenter's role either as county attorney or county prosecutor. The only evidence Olson musters for that proposition is Palmer's request that Carpenter procure and review Olson's cell phone extraction, which Carpenter then did. That request hardly establishes supervisory control. We decline to impose supervisory liability for a constitutional

violation where, at best, there was a cooperative relationship between colleagues. *See Felarca*, 891 F.3d at 820 ("Because these administrators had no supervisory authority over the police who allegedly committed the violations, they did not participate in or cause such violations.").

## II. Qualified Immunity (Carpenter)

On summary judgment, Carpenter is entitled to qualified immunity unless Olson raises a genuine issue of material fact showing (1) "a violation of a constitutional right," and (2) that the right was "clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotations omitted). Though Carpenter violated Olson's Fourth Amendment rights, the law was not clearly established at the time, thus entitling Carpenter to qualified immunity.

### A. Fourth Amendment Violation

We now turn to the more nuanced question presented by this appeal and one of first impression in this circuit: Whether Carpenter's review of the cell phone extraction—without consent, without a warrant, and without even a suspicion of further criminal activity by Olson or even Smith—violated Olson's Fourth Amendment rights. Under the circumstances presented here, we conclude that Carpenter's review of the cell phone data was an unreasonable search.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In assessing whether a government intrusion is a search, we ask whether "an individual 'seeks to preserve something as private,' and that expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Sanchez v. Los Angeles Dep't of*

*Transp.*, 39 F.4th 548, 555 (9th Cir. 2022) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Thus, our inquiry is whether Carpenter's review of Olson's cell phone extraction "violates a subjective expectation of privacy that society recognizes as reasonable." *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).

We can go straight to the Supreme Court for the answer to this question. In *Riley v. California*, the Court addressed "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." 573 U.S. 373, 378 (2014). The Court concluded that review of a cell phone was a Fourth Amendment search requiring a warrant. *Id.* at 386. Pointing to the ubiquity, storage capacity, and range of information available on the modern cell phone, the Court went on to characterize the cell phone as "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at 385. A search of these devices "implicate[s] privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse," because modern cell phones "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id.* at 393. "Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house." *Id.* at 396 (emphasis omitted). Given these weighty privacy interests, the Court held that "a warrant is generally required" to search a cell phone, absent application of another exception to the warrant requirement. *Id.* at 401.

The privacy interests recognized in *Riley* are just as pressing here. An "extraction" or a "phone dump" is typically an exact replica of the data contained on a cell

phone at the time of extraction, easily searchable and reviewable by law enforcement.[2] Put differently, it is the functional equivalent of Olson's phone at the moment she consented to the search by Idaho law enforcement.

In an effort to distinguish *Riley,* the best Carpenter can do is parrot the government's position in an out-of-circuit district court case, arguing that the search of a cell phone extraction is only a "subsequent viewing of a copy of electronic data from a cell phone," and not a standalone search of that cell phone. *United States v. Hulscher*, No. 4:16-CR-40070-1-KES, 2017 WL 657436 at *2 (D.S.D. Feb. 17, 2017). This is a distinction without a difference. The privacy interests in the cell phone are precisely the same as those in an extraction, and treating the two differently would introduce a gaping loophole in *Riley*'s warrant requirement.

Indeed*, Hulscher* rejects Carpenter's argument, and the district court's reasoning is consistent with *Riley*. Hulscher was investigated on unrelated charges by two separate agencies: the Huron Police Department and the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). The Huron Police, pursuant to a valid warrant, extracted the data from Hulscher's iPhone and created a digital copy. *Id.* at *1. The ATF subsequently requested from the Huron Police, and received, a copy of Hulscher's cell phone extraction, which

---

[2] Carpenter used a program called Cellebrite to review the extraction from Olson's cell phone. *See, e.g.*, Full File System Extraction – Mobile Device Forensics, Cellebrite, https://cellebrite.com/en/glossary/full-file-system-extraction-mobile-device-forensics (last accessed January 2, 2025) ("Full File System Extraction (FFS) is a specialized digital forensics technique used to obtain a complete copy of the file system from a digital device, such as a computer, smartphone, or tablet. It allows investigators to access a vast array of data, including active files, deleted files, system files, application data, and metadata.").

it sought to introduce at trial. The district court granted Hulscher's motion to suppress, determining that the search of cloned cell phone data was a standalone search requiring a separate warrant. *Id.* at \*3. Concluding otherwise—as *Carpenter* urges—"would allow for mass retention of unresponsive cell phone data" and "is simply inconsistent with the protections of the Fourth Amendment." *Id*. at \*3.

The Fourth Amendment concerns articulated in *Riley* apply with equal force to Olson's cell phone extraction. Accordingly, we conclude that Carpenter's subsequent review of Olson's cell phone extraction constitutes a Fourth Amendment search.

We next consider whether Olson consented to Carpenter's search in *Oregon* when she gave consent to the *Idaho* police to search her phone. It is well established that we determine the scope of consent by asking "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The consent form signed by Olson was titled "Idaho State Police Voluntary Consent to Search," and stated that it "hereby authorizes the Idaho State Police[] or its agent to conduct the search" of Olson's phone, and that "any evidence found as a result of such search could be taken and used against you in Court." Because "the scope of a search is generally defined by its expressed object," *id.* at 251, it is clear that this consent form envisions a search of Olson's phone by the Idaho State Police for evidence against her in criminal proceedings. We need not decide whether the use "in Court" is restricted to Idaho, as the cell phone evidence was not used against Olson in *any* court, or even to explore charges against Olson.

A plain reading of the consent form also confirms that Olson's consent in Idaho did not extend to a search by a different law enforcement agency, in another state, for evidence of her boyfriend's theoretical misdeeds. The language of Olson's consent form is distinguishable from a blanket consent form authorizing a "complete" search of a phone and any "materials . . . which [the government] may desire to examine," for any purpose. *United States v. Gallegos-Espinal*, 970 F.3d 586, 592 (5th Cir. 2020). Here, in contrast, Olson's consent form specifically limits authorization to the Idaho State Police or its agents. The form does not reserve, for the Idaho police, the right to share phone data with other law enforcement agencies for purposes unrelated to any criminal investigation, nor does the form consent to a search by *Oregon* police. And, unsurprisingly, no Oregon law enforcement authority claimed to act as an agent for the Idaho State Police. Palmer was "curious" about whether Olson's phone might reveal misconduct on Smith's part, and Carpenter was interested in reviewing the phone for possible *Brady* material in cases where Smith might testify. But neither Palmer's curiosity nor Carpenter's improbable search for *Brady* material for some hypothetical future investigation justifies expanding the consent form's express scope.

The limited scope of Olson's consent is further underscored by the actions of nearly everyone around Carpenter and Palmer when they embarked on seeking, and reviewing, Olson's data. At every turn, Carpenter and Palmer were stymied by other law enforcement personnel or agencies in both Idaho and Oregon that refused to aid them. The Idaho state trooper declined to give Palmer the extraction of Olson's phone, and the other criminal investigation agencies in Oregon declined to review the data

when asked by Carpenter, because there were no allegations of a crime, and therefore nothing for them to investigate. These circumstances, in addition to Carpenter's own testimony—that he has never gone out looking for potential *Brady* evidence on any other officers—highlight that what Carpenter was doing was highly irregular. It defies common sense to hypothesize a potential *Brady* complication when there has been no prosecution, no investigation, nor even a whiff of criminal activity. Although Palmer denies sharing the contents of Olson's phone with members of the public, Olson's allegations that strangers made derogatory comments to her regarding the circulation of her nude photos also support the claim that Olson's private information was shared far beyond the scope of her original consent.

Our decision in *United States v. Ward* is instructive in focusing on the scope and timing of consent. 576 F.2d 243, 244–45 (9th Cir. 1978). In *Ward*, we affirmed the suppression of evidence gathered after a defendant revoked his consent to a search, but declined to suppress any "evidence gathered or copies made" pursuant to valid consent before consent was revoked. In *Ward,* we emphasized consent's key role in demarcating the boundaries of a search, noting that "when the basis for the search is consent the government must conform its examination to the limits of the consent." *Id.* at 244 (internal quotations omitted). Unlike in *Ward*, where the government was free to keep and continue to examine any copies made pursuant to Ward's valid and active consent, Olson's consent form plainly never contemplated the search conducted here.

Carpenter's mistaken reliance on the Idaho prosecutor's "apparent authority" to consent on Olson's behalf also does not help his case. The Idaho police could not somehow waive Olson's Fourth Amendment right on her behalf,

because "it was [Olson's] constitutional right which was at stake here . . . . It was a right . . . which only [Olson] could waive." *Corngold v. United States*, 367 F.2d 1, 6 (9th Cir. 1996) (quoting *Stoner v. State of California*, 376 U.S. 483, 489 (1964)). Based on the parties' briefing, nothing suggests a person of "reasonable caution" would believe the Idaho police could consent on Olson's behalf, and Carpenter has not attempted to argue otherwise. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

Carpenter's claim that his conduct comported with longstanding practices of electronic data sharing between law enforcement agencies is devoid of any supporting authority. In any case, we need not reach the separate question of whether, and how, law enforcement agencies may share electronic data with each other, or whether law enforcement agencies may retain such data for their own future investigations, because Olson's consent form plainly did not authorize the sharing of electronic data that took place here.

Finally, the third-party doctrine is not applicable in this context and does not exempt the Oregon police from obtaining consent, or a warrant, when performing the subsequent search. The third-party doctrine generally holds that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). "[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose." *United States v. Miller*, 425 U.S. 435, 443 (1976).

To begin, the third-party doctrine has not previously been applied to instances where the "third party" to whom information is revealed is a law enforcement agency. There is good reason to doubt its application here. In the third-party context, an individual is presumed to "take[] the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443. To hold that Olson relinquished any expectation of privacy in her private data upon consenting to a law enforcement search for a limited purpose would put the third-party doctrine on a collision course with *Riley* and the Court's cases involving consent searches.

Apropos of the sensitive data here, the Supreme Court has rejected "mechanically applying" the third-party doctrine without considering "the nature of the particular documents sought." *Carpenter v. United States*, 585 U.S. 296, 314 (2018) (internal quotations and citations omitted). Crucially, the Court in *Carpenter* distinguished *Smith* and *Miller*, where the government sought access to third-party material revealing "little in the way of identifying information," from instances where access was sought to "private letters, digital contents of a cell phone," or "any personal information reduced to document form." *Id.* at 318–19; *see also Sanchez*, 39 F.4th at 559–60 (distinguishing rental e-scooter location data from cell phone location data). The extraction of Olson's cell phone falls within the heartland of *Carpenter*'s reach.

Finally, we conclude that Carpenter's search does not fall into any exception to the warrant requirement, nor was the search a "reasonable search[] for which no warrant was required." *United States v. Rabinowitz*, 339 U.S. 56, 60 (1950) (overruled in part on other grounds by *Chimel v. California*, 395 U.S. 752 (1969)). "To say that no warrant is

required is merely to acknowledge that 'rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.'" *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 331 (2001)).

We have no difficulty concluding that Carpenter's search was unreasonable. As we reiterated in *United States v. Lara*, "the Court in *Riley* stressed the amount and character of data contained in, or accessed through, a cell phone and the corresponding intrusiveness of a cell phone search." 815 F.3d 605, 611 (9th Cir. 2016). The data extracted here— some of the most private that can be found in our lives— proves the point. *Riley*, 573 U.S. at 395.

Compared to those weighty privacy interests, the two asserted government interests are unavailing. Palmer was "curious" about whether Olson's phone might reveal misconduct on Smith's part. Carpenter was interested in reviewing the phone for possible *Brady* material in cases where Smith might testify. Olson was arrested in Idaho for the possession of marijuana, which is not illegal in Oregon, and there was no reason for Palmer or Carpenter to suspect that Smith had taken part in criminal activity. Not surprisingly, Carpenter was never able to articulate which cases he was concerned that Smith would testify in, and for which any *Brady* material regarding this incident would be relevant. No precedent supports invoking a hypothetical *Brady* concern to overcome the warrant requirement.

Even the most "[u]rgent government interests are not a license for indiscriminate police behavior." *Maryland v. King*, 569 U.S. 435, 448 (2013). The government interests here are not plausible, let alone urgent, and its behavior was wholly indiscriminate. Accordingly, we hold that

Carpenter's warrantless search of Olson's cell phone constituted a Fourth Amendment violation.

### B. Clearly Established Law

Although we conclude that Carpenter's warrantless search of Olson's cell phone constituted a Fourth Amendment violation, the law was not clearly established at the time of the search. A government official "violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). "[R]easonableness is judged against the backdrop of the law at the time of the conduct," in this case, 2019. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Although a case does not have to be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

Olson does not cite to any Supreme Court or Ninth Circuit authority that places the constitutional violation as "beyond debate" and none have "clearly established the rule on which [Olson] seek[s] to rely." *Evans*, 997 F.3d at 1066 (internal quotations omitted). For example, Olson points to *Walter v. United States*, 447 U.S. 649, 656 (1980), which stands for the general proposition that a search based on consent is "limited by the terms of its authorization." That case does not, however, answer the question of whether it was clearly established that Carpenter conducted an unauthorized search, which turns not only on the terms of the consent form, but also on whether review of a phone extraction by a separate law enforcement unit is a search at all. Olson's effort to rely on *United States v. Estrella*, 69

F.4th 958 (9th Cir. 2023), is similarly unavailing. In addition to postdating the events here by four years, *Estrella* deals with suspicionless search and seizure conditions imposed pursuant to parole, and bears little relevance to the facts here.

Likewise, *Stoner v. California*, 376 U.S. 483 (1964), and *United States v. Kimoana*, 383 F.3d 1215 (10th Cir. 2004), are similarly inapt. This is not a third-party consent case; the question is not whether the Idaho police themselves had authority to consent to Carpenter's search of Olson's phone. The question is whether Carpenter's subsequent search exceeded the scope of Olson's initial consent, and neither *Stoner* nor *Kimoana* answer it.

Finally, *Riley v. California*, the case upon which Olson primarily relies, held that police may not invoke the doctrine of search incident to arrest to search the contents of an arrestee's phone without a warrant. 573 U.S. at 403. But *Riley* says little about the consent issue central to this case. The "sweeping language" both this court and the Supreme Court have used "to describe the importance of cell phone privacy," *Lara*, 815 F.3d at 611, does not itself suffice to create clearly established law in an entirely different context.

Although we have the option to avoid the constitutional question and reach only the "clearly established law" prong of the qualified immunity analysis, we undertake the two-step *Saucier* analysis because "develop[ing] constitutional precedent" in this area would be helpful. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (alteration in original). This case presents a question which "do[es] not frequently arise in cases in which a qualified immunity defense is unavailable" and thus use of the two-step procedure is "especially valuable." *Pearson*, 555 U.S. at 236; *see also* John C. Jeffries, Jr., *Reversing the Order of Battle in*

*Constitutional Torts*, 2009 Sup. Ct. Rev. 115, 136 (2009) (noting that qualified immunity defense is typically available in cases involving "searches and arrests not aimed at successful prosecution, but rather at the assertion of police authority or . . . police harassment"). Because it is important to lay down a marker for future cases, we heed the Court's call in *Pearson* to develop constitutional precedent and conclude that Carpenter's search infringed on Olson's Fourth Amendment rights. *Pearson*, 555 U.S. at 236. However, we affirm the district court's decision to grant qualified immunity to Carpenter because the law was not clearly established at the time he undertook the search of Olson's phone records.

   **AFFIRMED.**

---

BRESS, Circuit Judge, concurring in part and concurring in the judgment:

   I agree that the claims against Sheriff Palmer fail because there is no evidence he exercised supervisory control over County Prosecutor Carpenter. I also agree that Carpenter is entitled to qualified immunity because any constitutional violation was not clearly established. These points are sufficient to resolve this appeal, and I would end the analysis there.

   The majority takes a more expansive approach, finding in Part II.A that Carpenter violated Olson's Fourth Amendment rights. I join only Parts I and II.B of the court's opinion. Because Carpenter is entitled to qualified immunity based on the lack of clearly established law, it is not necessary to decide whether Carpenter violated the Fourth

Amendment. There may be instances in which it is helpful to the development of the law to answer the underlying constitutional question even when the defendant prevails on qualified immunity grounds. But this is not such a case.

The reasons are several. We received limited briefing on the constitutional questions that the court unnecessarily resolves today. The district court did not reach these constitutional questions. The facts of this case are unusual, providing an infirm foundation for constructive exposition of the law. And the issues are more complicated than the majority allows, raising questions about when law enforcement agencies may share information among themselves, why it violated the Fourth Amendment for Carpenter to review information provided to him by an Idaho prosecutor, whether Carpenter should be charged with knowing about the scope of Olson's consent, and whether fault more properly lies with the Idaho authorities, who are not defendants here. There was no need to get into these issues, and this case provided a poor platform for doing so. In my respectful view, prudence here dictated that we decide only what we needed to decide.